UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 09-21092-Civ-COOKE/BANDSTRA

FIRST GLOBAL CORP.,

    Plaintiff

vs.

MANSIANA OCEAN RESIDENCES, LLC,

    Defendant.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

THIS CASE is before me on the Plaintiff's Motion for Summary Judgment on Counts I and II of the Amended Complaint [D.E. 16]. I have reviewed the Parties' arguments, the record, and the relevant legal authorities. For the reasons explained in this order, the Plaintiff's Motion for Summary Judgement is granted as to Counts I and II of the Amended Complaint.

**I. BACKGROUND**

This is an action for rescission and damages brought pursuant to the Interstate Land Sales Act ("ILSA"), 15 U.S.C. §§ 1701-1720. Plaintiff, First Global Corporation ("FGC"), entered into a pre-construction purchase agreement to buy a condominium unit from Defendant, Mansiana Ocean Residences, LLC, on April 26, 2006. (Pl.'s S. of Material Facts ¶ 10 [D.E. 17]).[1] The condominium unit was within the Solis Resort and Spa Residences Project, located in Sunny Isles Beach, Florida. (*See id.* ¶¶ 1-3). The Solis Project consisted of 134 or 135 residential units. (*Id.* ¶ 4). Mansiana did not register the Solis Project with the Secretary of Housing and Urban Development. (*Id.* ¶ 9).

---

[1] The facts set out in Plaintiffs' Statement of Material Facts are deemed admitted to the extent that they are supported by evidence in the record, since Mansiana did not file an opposing statement of facts controverting Plaintiff's statement. S.D. Fla. L.R. 7.5(D); *see also Gossard v. JP Morgan Chase & Co.,* 612 F. Supp. 2d 1242, 1245-1246 (S.D. Fla. 2009).

Mansiana did not provide FGC with a property report in advance of the signing of the purchase agreement.  (*Id.* ¶ 13).  Mansiana did not include a provision in the land-sale contract notifying FGC that if it did not receive a property report before signing the contract, then it had a right to revoke the agreement within two years from the date of the signing.  (*Id.* ¶ 26).

FGC moved for summary judgment as to counts I and II of the Amended Complaint, arguing that Mansiana did not comply with the requirements of the ILSA.  Mansiana does not argue that it complied with the requirements of the ILSA; rather, it asserts that the ILSA requirements did not apply to the Solis Project because of two specific statutory exemptions.

## II.  LEGAL STANDARDS

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).

## III.  DISCUSSION

"[T]he [ILSA] is an antifraud statute utilizing disclosure as its primary tool . . . to protect purchasers from unscrupulous sales of undeveloped home sites, frequently involving out-of-state sales of land purportedly suitable for development but actually under water or useful only for grazing." *Winter v. Hollingsworth Properties, Inc.*,  777 F.2d 1444, 1446-47 (11th Cir. 1985).  The ILSA requires developers of subdivisions to register their projects with the Secretary of Housing and Urban Development and comply with certain regulations and requirements.  *See* 15 U.S.C. § 1704(a).  Unless specifically exempted under the ILSA, it is unlawful to sell a lot without first having filed a statement of record.  15 U.S.C. § 1703(a)(1)(A).  It is also unlawful to sell a lot

"unless a printed property report . . . has been furnished to the purchaser . . . in advance of the signing of any contract," unless the property is exempted from the ILSA. 15 U.S.C. § 1703(a)(1)(B).[2]

If the land-sale contract obligates the seller to construct a building on the property within two years, the property is exempt from the requirements of the ILSA. 15 U.S.C. § 1702(a)(2). This is known as the "two-year exemption." *Double AA Int'l. Inv. Group, Inc. v. Swire Pac. Holdings, Inc.*, 674 F. Supp. 2d 1344, 1353 (S.D. Fla. 2009). Similarly, if there are "fewer than one hundred lots which are not exempt," then the sale of those lots are exempt under the 100-lot exemption. 15 U.S.C. § 1702(b)(1); 24 C.F.R. § 1710.6. These two exemptions may be used in conjunction with one another. *Double AA*, 674 F. Supp. 2d at 1353. In other words, if a project consists of 123 units, a developer can sell 24 of the units under an obligation to construct a building on the property within two years, *i.e.* qualifying for the two-year exemption, and the remaining 99 units would *then* qualify under the 100-lot exemption. *See id.* at 1353-54. If the "method of disposition" is adopted for the purpose evading the ILSA then neither of these exemptions apply. 15 U.S.C. §§ 1702(a) and (b).

"[T]he [ILSA] is a remedial statute intended to protect consumers from unscrupulous sales practices and requires ambiguities concerning exemptions to be construed narrowly." *Gentry v. Harborage Cottages-Stuart, LLLP*, 602 F. Supp. 2d 1239, 1248 (S.D. Fla. 2009). In this respect, the time for determining whether a particular project or unit is entitled to one of the statutory exemptions of the ILSA is when the buyer purchases the unit. *See Grove Towers, Inc. v. Lopez*, 467 So. 2d 358, 361 (Fla. Dist. Ct. App. 1985) ("Since the purpose of the act is to protect purchasers

---

[2] A "lot" refers to interests in realty, including condominiums. *Winter v. Hollingsworth Properties, Inc.*, 777 F.2d 1444, 1448 (11th Cir. 1985).

against fraudulent land sales schemes, it is only reasonable that the statute require full disclosure before the purchasers sign a contract."); *accord Rensin v. Juno-Loudon, LLC*, No. 09-1391, 2010 WL 1381546, at *7 (E.D. Va. Mar. 30, 2010) ("When determining whether or not the subdivision is one 'containing fewer than one hundred units,' the number of nonexempt lots in the subdivision should be determined contemporaneously with when the purchaser enters into the purchase agreement for the lot in the subdivision.").

In this case, Mansiana asserts two arguments in opposition to FGC's Motion for Partial Summary Judgment. First, Mansiana argues that it should be permitted to combine, or stack, the two-year exemption and the 100-lot exemption, in order to exempt all of the units in the Solis Project from the requirements of the ILSA. (Def.'s Opp. to Pl.'s Mot. for Summ. J. 2 [D.E. 25]). Second, Mansiana asserts that there was some uncertainty as to how many residential units would be built, and that ultimately the Solis Project might consists of less than 100 residential units, thereby qualifying for the 100-lot exemption. (*Id.* at 3-4).

Replying to Mansiana's first argument, FGC points out that at the time FGC contracted to purchase the condominium unit, none of the other units has been sold with a two-year commitment to build. (*See* Pl.'s S. of Material Facts ¶¶ 17, 22 [D.E. 17]). Under the ILSA, a unit cannot qualify for the two-year exemption until the unit is actually sold with a commitment to construct a building on the property within two years. *See Rensin*, 2010 WL 1381546, at *7-8. (explaining that, if an actual sale were not required then "a purchaser's rights to full disclosure of the rights of revocation and complete information in the form of the property report could be vitiated simply by a developers' stated (but unfulfilled) intention to later sell sufficient lots [with a commitment to build within two years], therefore bypassing Congress' intent to protect potential purchasers through pre-purchase disclosure").

Since Mansiana had not sold any of the units with a two-year commitment to build at the time that FGC purchased its unit, there were more than 100 units which were not exempt at the time. Under these circumstances, the unit purchased by FGC was not exempt from the requirements of the ILSA.

Mansiana's second argument – that there was some uncertainty as to how many residential units would be built, and that ultimately the Solis Project might consists of less than 100 residential units – also fails. The timeline of relevant facts is as follows:

- On March 6, 2006, a press release was issued regarding the Solis Resort and Spa Residences Project. This press release indicated that the Project would consist of 135 residential units. (*Cf.* Pl.'s S. of Material Facts ¶ 5 [D.E. 17]; Press Release, Forkosh Dev. Group, Forkosh Dev. Announces Solis Resort, Spa & Residences (Mar. 30, 2006) (*available at* http://www.forkoshdevelopmentgroup.com/news/press/ (last visited May 19, 2010)).[3]

- On or around April 26, 2006 (coinciding with the signing of the purchase agreement by FGC) FGC received a document regarding the Solis Project titled "SUMMARY OF CERTAIN ASPECTS OF THE OFFERING." (Scemana Decl. ¶ 2 [D.E. 20]). This summery described the Solis Project as a "Building containing a total of one hundred thirty seven (137) Units, consisting of one hundred thirty five (135) Residential Units, one (1) Shared Components Unit and one (1) Hotel Unit." (Scemana Decl., Ex. A [D.E. 20]).

- On February 8, 2007, March 17, 2008, May 20, 2008, and June 19, 2008, additional press releases were issued regarding the Solis Project indicating that the Project would consist of 135 residential units. Press Release, Forkosh Dev. Group, Solis Resort, Spa & Residence Offers Kosher Meals in Its Sunny Isles Location (Feb. 8, 2007); Press Release, Forkosh Dev. Group, Forkosh Dev. Group Breaks Ground for Solis Resort, Spa & Residences (Feb. 8, 2007); Press Release, Forkosh Dev. Group, Construction Progressing Smoothly on Solis Resort Spa & Residences in Sunny Isles (Mar. 17, 2008); Press Release, Forkosh Dev. Group, Construction Continues to Progress Smoothly on Solis Resort Spa & Residences in Sunny Isles (May 20, 2008); Press Release, Forkosh Dev. Group, Forkosh Dev. Group

---

[3] It is within the scope of Federal Rule of Evidence 201 for a court to take judicial notice of a press release, for the limited purpose of noting the existence of the press release's message. *See Shahar v. Bowers*, 120 F.3d 211, 214, n.5 (11th Cir. 1997) (explaining the distinction between taking judicial notice of the fact that a press release says "X," as opposed to accepting a press release's statements as true). I am *not* taking judicial notice that Mansiana intended to include 135 residential units in the Solis Project. I am taking judicial notice that press releases were issued which indicated that the Solis Project consisted of 135 residential units.

>     Forges Alliance With Prince and Princess from The Strozzi Family (June 19, 2008) (*available at* http://www.forkoshdevelopmentgroup.com/news/press/ (last visited May 19, 2010)).

- On November 13, 2009, Daniel Tantleff, the person designated by Mansiana as the person with the most knowledge as to the Solis Project testified that the Solis Project consists of 134 residential units.  (Tantleff Dep. 15:14-22, Nov. 13, 2009 [D.E. 21]).

- On March 10, 2010, Alex Forkosh, through his sworn declaration addressing the Solis Project, testifies that "there was uncertainly as to the actual number of condominium units which were going to be constructed."  (Forkosh Decl. ¶ 2 [D.E. 24]).  Mr. Forkosh explains that "it was anticipated that potential purchases may seek to consolidate 2 or more units into one unit," and "[d]epending on the response to the marketing of the condominium units, consideration would be given to increasing the size of the hotel component of the Project, thereby resulting in less than 100 condominium units to be included in the Project."  (*Id.* ¶ 3).

For purposes of the 100-lot exemption, the relevant number is the number of units communicated by the developer to the buyer and the purchasing public, regardless of whether the developer contemplated adjusting the ultimate number of units downward to less than 100.  *Grove Towers, Inc. v. Lopez*, 467 So. 2d 358, 361 (Fla. Dist. Ct. App. 1985) (concluding that where a developer planned and advertised for a 108 unit project, it was obligated to comply with ILSA, even though, ultimately, only 96 units were completed.).  Whatever consideration was given by Mansiana to reducing the Solis Project to less than 100 units, it is undisputed that at the time that FGC contracted to purchase its unit, the only information communicated to FGC, and to the public at-large, was that the Solis Project would consist of 135 units.  Despite Mansiana's speculation that the Solis Project might ultimately result in less than 100 units, it is not disputed that Mansiana publically advertised (through its press releases), and privately communicated (through the "Summary of Certain Aspects of the Offering" given to FGC) that the Solis Project would consist of 135 units.  Drawing all reasonable inferences from Alex Forkosh's declaration in favor of Mansiana, there is no evidence to suggest that the idea that the project might ultimately consist of less than 100

units was every disclosed to anyone outside of Mansiana. (*See* Forkosh Decl. [D.E. 24]).

Additionally, Mansiana had an affirmative duty to maintain records to support its claim of exemption under the ILSA. 24 C.F.R. § 1710.4(d) ("If a developer elects to take advantage of an exemption, the developer is responsible for maintaining records to demonstrate that the requirements of the exemption have been met."). Mansiana has not presented any records to demonstrate that the Solis Project would meet the requirements of the 100-lot exemption – to the contrary, the only records before the Court regarding the intended number of units in the Solis Project is the "Summary of Certain Aspects of the Offering," which clearly indicates that the Solis Project would consist of 135 residential units. (Scemana Decl., Ex. A [D.E. 20]).

Finally, Mansiana's suggestion that the project might ultimately result in fewer than 100 units, is contradicted by its initial argument that its plan was to stack the 100-lot exemption and the two-year exemption by selling units 100 and beyond under an obligation to construct a building within two years. In other words, if it was Mansiana's plan to sell the first ninety-nine units without any firm commitment to build within two-years, and to then sell all remaining units with a two-year obligation, and thus stack the two exemptions – it cannot also assert that it intended for the Solis Project to be less than 100 units, because its plan to offer for sale more than 100 units forecloses the second position.

## IV. CONCLUSION

The undisputed facts in this case reveal that at the time that FGC purchased the condominium unit, no units had been sold with a commitment by Mansiana to construct a building within two years. The two-year exemption requires an *obligation*, not merely an intention, to build. *See* 15 U.S.C. § 1702(a)(2). Despite Mansiana's intention to sell future units with a two-year commitment, since none of the units were actually under contract, they could not qualify for the

ISLA's two-year exemption.

Additionally, there is no dispute that the common promotional plan for the Solis Project was marketed to the public, and specifically to FGC, as consisting of 135 units. Even if Mansiana considered the possibility that the Project might ultimately be downsized to less than 100 units, it cannot be disputed that, at the time that FGC purchased the unit from Mansiana, the Solis Project consisted of more than 100 units, because more than 100 units were up for sale.

Since the Solis Project was not exempt from the provisions of the ILSA, Mansiana was in violation of the ILSA when it: (a) did not register the Solis Project with the Secretary of Housing and Urban Development; (b) did not provide FGC with a property report in advance of the signing of the purchase agreement; and (c) did not include a provision in the land-sale contract notifying FGC that if it did not receive a property report before signing the contract, then it had a right to revoke the agreement within two years from the date of the signing.

It is **ORDERED and ADJUDGED** that the Plaintiff's Motion for Summary Judgment on Counts I and II of the Amended Complaint [D.E. 16] is **GRANTED**. Judgment is entered in favor of the Plaintiff, First Global Corporation, and against the Defendant, Mansiana Ocean Residences, LLC, as to Counts I and II of the Amended Complaint.

**DONE and ORDERED** in chambers, at Miami, Florida, this 27th day of May 2010.

*Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Ted E. Bandstra, U.S. Magistrate Judge*
*Counsel of record*